643 A.2d 513

**COMPTROLLER of the TREASURY**

v.

**MARTIN G. IMBACH, INC.**

**No. 1609, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

July 1, 1994.

Certiorari Denied Dec. 7, 1994.

Deborah B. Bacharach, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Gaylin Soponis and Sheldon H. Laskin, Asst. Attys. Gen., on the brief), Baltimore, for appellant.

J. Ronald Shiff (Nancy M. Juda and Gordon, Feinblatt, Rothman, Hoffberger & Hollander, on the brief), Baltimore, for appellee.

Argued before ALPERT, CATHELL and MOTZ*, JJ.

ALPERT, Judge.

In this case, we are asked to decide whether marine-based equipment is exempt from Maryland sales and use tax. Martin G. Imbach, Inc., ("Imbach" or appellee), a Maryland corporation, is located in Baltimore City and is engaged in the business of marine and heavy construction.[1] Imbach is licensed to do business in Maryland, Virginia, and Delaware. Imbach owns several pieces of equipment, including tug boats, barges, floating and land-based cranes, pick-up trucks and a bulldozer. It is the acquisition of some of this equipment that is the subject of this appeal.

The Comptroller of the Treasury for the State of Maryland (the Sales and Use Tax Division) ("Comptroller") conducted an audit of Imbach's equipment acquisition for the period beginning July 1, 1987 thru June 30, 1991. The Comptroller concluded that Imbach had erred in claiming an exemption pursuant to Article 81, § 326(gg) (1957).[2] Accord-

---

* Judge Motz participated in the argument and decision in this case but resigned from the Court prior to the filing of the Opinion.

1. This fact is stated on their letterhead.

2. Subsequently recodified as Md.Code Ann., Tax–General Article § 11–208(c) (1988 & Supp.1993).

ingly, the Comptroller assessed Imbach additional sales and use tax,[3] interest, and penalty.[4]

Imbach appealed the Comptroller's decision to the Maryland Tax Court. The Tax Court held a hearing on January 13, 1993, and affirmed the Comptroller's assessment.[5] Imbach appealed to the Circuit Court for Baltimore City and that court remanded the case to the Tax Court for further proceedings in accordance with the Court's decision. On appeal, the Comptroller asks:

I.  Did the Circuit Court improperly overturn the Tax Court's conclusion that equipment that is not used principally in the movement of passengers or freight in interstate commerce does not qualify for the exemption formerly set forth in Article 81, § 326(gg)?

II.  Did the Circuit Court improperly remand the case to the Maryland Tax Court for further evidence that is not probative of the relevant legal inquiry?

III.  Did the Circuit Court err in remanding the case to the Maryland Tax Court for further evidence on a variety of miscellaneous matters, without restriction, when Imbach never applied for leave to offer additional evidence and no reasons were presented for Appellee's failure to offer the

---

3.  The sales and use tax provisions were enacted to assure that the State collects tax from the final purchaser and to avoid a pyramiding of the tax. *See Palm Oil Recovery, Inc. v. Comptroller of Treas.*, 266 Md. 148, 159, 291 A.2d 681 (1972).

4.  The initial assessment was as follows:

| | |
|---|---|
| Sales and Use Tax | $ 84,715.52 |
| Interest Accrued to Date | 28,617.98 |
| Penalty | 8,422.01 |
| Minus: | |
| Offset Credit | < 495.44> |
| Total | $ 121,260.07 |

5.  The Tax Court, however, adjusted the assessment to $78,463.70 plus interest and penalty.

evidence on these points in the proceedings before the Maryland Tax Court, as required by § 10–215(e), State Government Article?

For the reasons that follow, we conclude that the trial court erred in remanding the case to the Tax Court.

## I.

### Scope of Appellate Review of Tax Court Decisions

■ The decisions of the Maryland Tax Court are subject to judicial review pursuant to Md.Code Ann., Tax–General Article § 13–532 (1988, 1992 Cum.Supp.). Recently, in *Rossville Vending v. Comptroller,* 97 Md.App. 305, 311–12, 629 A.2d 1283, *cert. denied,* 333 Md. 201, 634 A.2d 62 (1993), we described the scope of appellate review in these matters thusly:

> It is well settled that judicial review of decisions of the Maryland Tax Court is severely limited. Nevertheless, "a reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law." Where the interpretation of a statute or regulation is at issue, the substituted judgment standard is used since such an interpretation involves a question of law.

(citations omitted). In other words, an appellate court will reverse a decision of the Tax Court if the agency erroneously determines or erroneously applies the law. *See, e.g., State Dep't of Assessments & Taxation v. Consumer Programs, Inc.,* 331 Md. 68, 71–72, 626 A.2d 360 (1993); *Baltimore Building & Construction Trades Council v. Barnes,* 290 Md. 9, 14–15, 427 A.2d 979 (1981).

## II.

### Does the Equipment qualify for an Exemption?

#### 1. Relevant Law

In the instant case, we are required to determine the breadth of the sales and use tax exemption. Before we

proceed into the substantive issues presented to us on appeal, we must clarify the applicable law because the current section has undergone three different revisions.[6] The audit encompassed July 1, 1987 thru June 30, 1991. Md.Code Ann., Article 81, § 326(gg) (1957), the relevant provision that was applicable until January 1, 1989, stated in pertinent part:

**Exemptions—In general.**

The tax hereby levied does not apply to the following sales:

\* \* \* \* \* \*

(gg) *Aircraft, vessels, rolling stock and motor vehicles used in interstate and foreign commerce.*—Sales of aircraft, vessels, railroad rolling stock, and motor vehicles, which will be used principally in the movement of passengers or freight, or both, in interstate and foreign commerce, and sales of replacement parts and other tangible personal property to be used physically in, on, or by them.

The General Assembly enacted this section effective July 1, 1977. *See* H.B. 211, Chapter 394, Acts 1977.

This section was subsequently recodified in 1989 at § 11–208(c) of the Tax–General Article as follows:

**Interstate or foreign commerce or use in another state.**

(c) *Conveyances.*—The sales and use tax does not apply:

(1) to a sale of an aircraft, motor vehicle, railroad rolling stock, or vessel that is used principally in interstate or foreign commerce;

The revisor's note states that "the former reference to use 'in the movement of passengers or freight, or both' is deleted as unnecessary in light of the reference to use [in] 'interstate or foreign commerce.'" This provision was effective from Janu-

---

6. Article 81 of the Md.Ann.Code (1957) was repealed in its entirety and concurrently re-enacted, in substantial portion, in the Md.Code Ann., Tax–General Article.

ary 1, 1989 through the end of the audit period (*i.e.,* June 30, 1991).[7]

## 2. *Statutory Interpretation*

In its simplest form, this case is one of statutory interpretation. Accordingly, we now examine the applicable rules. The principal rule of statutory construction is to ascertain and carry out the intent of the Legislature, *see State v. Bricker,* 321 Md. 86, 92, 581 A.2d 9 (1990); *Privette v. State,* 320 Md 738, 744 (1990), and the primary source of such intent is the language itself. *State v. Intercontinental, Ltd.,* 302 Md. 132, 137, 486 A.2d 174 (1985). In addition to the language of the statute itself, a reviewing court can scrutinize the general purpose, aim, or policy behind the statute, *Kaczorowski v. City of Baltimore,* 309 Md. 505, 513, 525 A.2d 628 (1987), and the language in the context in which it was adopted. *Motor Vehicle Admin. v. Mohler,* 318 Md. 219, 225, 567 A.2d 929 (1990). Finally, we can also examine the development of a statute to discern legislative intent that may not be as clear upon initial examination of the current language of the statute. *Id.* at 225–27, 567 A.2d 929.

In construing tax statutes, we are guided by the Court of Appeals' pronouncement in *Comptroller of the Treasury v. John C. Louis Co.,* 285 Md. 527, 539, 404 A.2d 1045 (1979), that the established rule is "not to extend the tax statute's provisions by implication, beyond the clear import of the language used, to cases not plainly within the statute's language, and not to enlarge the statute's operation so as to embrace matters not specifically pointed out." The Court of

---

7. Effective May 1, 1992, the General Assembly changed the wording of the statute to read

(c) Conveyances.—The sales and use tax does not apply:
(1) to a sale of an aircraft, motor vehicle, railroad rolling stock, or vessel that is used principally *to cross State lines* in interstate or foreign commerce.
(emphasis added) Thus, the only change was the insertion of the words "to cross State lines." We agree with the Tax Court's conclusion that the current statute is of no significance to our analysis.

Appeals has also stated in *C & P Telephone v. Comptroller,* 317 Md. 3, 11–12, 561 A.2d 1034 (1989) that

> [i]t is fundamental that statutory tax exemptions are strictly construed in favor of the taxing authority and if any real doubt exists as to the propriety of an exemption that doubt *must* be resolved in favor of the State. In other words, "to doubt an exemption is to deny it." ... [T]he State's taxing prerogative is never presumed to be relinquished and the abandonment of this power must be proved by the party asserting the exemption.

(citing *Xerox Corp. v. Comptroller,* 290 Md. 126, 137, 428 A.2d 1208 (1981) (emphasis in the original).

## The Plain Meaning Rule

■ The Comptroller contends that the Tax Court was correct in affirming its assessment because the equipment at issue was not covered by any exemption. The Comptroller asserts that the "plain meaning" of the statute, the case law and policy behind the exemption support its position.

Imbach's contention primarily concerns three crawler cranes and a pedestal crane that was subsequently installed on a barge. Imbach describes the equipment as follows:

> Some cranes, known as derricks, float on the water and are incorporated into a hull. The derricks never leave the water and are vessels. Other cranes, known as "crawlers", are physically attached to barges. While it is possible to remove a crawler from a barge and use the crawler on land, such removal is time consuming, difficult, and expensive. Accordingly, crawlers are rarely, if ever, removed from barges to which they are attached. The only practical difference between a derrick and a crawler attached to a barge is the stability of the crane. That is, a derrick is more stable and can be used for more difficult or heavier jobs.

Imbach asserts that the "plain meaning" of the statute does not require the vessel to actually move or carry passengers or freight in interstate commerce. Instead, we are advised that

our decision should be guided by the words "used principally *in the movement of* passengers or freight" because "interstate commerce is *not limited* to such activities." In this respect, Imbach baldly asserts, that "when the Revisors deleted such phrase as surplusage, it was in recognition of the fact that *all* interstate commerce is involved in the movement of passengers and freight." Imbach cites to our decision in *United Parcel Service, Inc. v. Comptroller of Treasury,* 69 Md.App. 458, 471, 518 A.2d 164 (1986), for the proposition that § 326(gg) does not "impose a line-crossing requirement and ... [that] interstate movement of packages and freight carried by the vans constituted interstate commerce and that the vans were an integral part of the nationwide interstate commerce system." Imbach then suggests that

> Imbach's vessels, which regularly construct, repair, and improve the facilities of interstate commerce, are engaged in interstate commerce to the same extent as the tugboats, stevedores, and dredges. Interstate commerce begins when goods are picked up by a truck or a train. That trip continues when the goods are deposited on the docks and piers constructed and maintained by Imbach. It continues on the oceangoing ships which are serviced and repaired by Imbach's floating derricks. Interstate commerce continues when the ships are unloaded onto the piers constructed and repaired by Imbach and it ends when goods are delivered by truck or rail to their final destination. Surely, Imbach's activities and equipment, like stevedoring operations and machinery, are an integral part of interstate commerce, without which no commerce would ever be moved.

We disagree and explain.

In finding for the Comptroller, the Tax Court stated:

> I don't think that the fact that [Imbach] may be rendering a service[ ] to, or doing construction work for other people or companies that are engaged in interstate commerce necessarily means that their activities would be considered as those that are principally involved in the movement of passengers or freight, which is the way the law used to

read, and now it ... describes the various items, and it says used principally in interstate or foreign commerce.

The court then distinguished *United Parcel Service, Inc.* from the case before it because

[*United Parcel Service, Inc.*] was a situation where no one disagreed that UPS was involved in interstate commerce. It's one company that unquestionably is involved in interstate commerce ... And in effect it's a[ ] situation where it's the same company that is involved in everything. And that's where the difference, or really a major difference between at least the UPS case comes in my mind, as opposed to what we are dealing with here.

In effect what the [appellee] in this case is saying is that our nexus comes from the fact that we do this work for all these other different companies that are very obviously engaged in interstate commerce, and therefore because of that, we should be categorized as someone who is principally engaged in interstate commerce.

We agree with the Tax Court's reasoning. In *United Parcel Service, Inc.*, 69 Md.App. at 462, 518 A.2d 164, we held that the common carrier's delivery vans, that were used exclusively for intra-state delivery of packages, were "integral components of [a] nationwide interstate delivery service and are thus exempt from taxation." In so doing, we reviewed § 326(gg) and noted that the language "clearly indicates that movement of passengers or property, and not vehicles, is the linchpin of the test for determining the scope of the exemption." *Id.* at 472, 518 A.2d 164. We then reasoned that "[o]n its face, the statute does not impose a line-crossing test: nowhere does the statute differentiate between interstate carriers whose vehicles cross state borders and those whose vehicles do not cross state lines ... Reading these words literally, we hold their import to be that the freight, and not vehicles, must cross state lines." *Id.* The delivery vans were exempted because, even though the vans were not engaged in any "line-crossing," they were facilitating the flow of the packages (*i.e.*, interstate cargo). In other words, our decision was premised upon the

fact that, in that case, the party seeking the exemption was the one engaged in interstate commerce and that the vans were transporting "interstate cargo."

The crux of Imbach's argument is that, because it builds structures such as piers, bulkheads, and drydocks on behalf of commercial and government entities, that may be used in interstate commerce, it is engaged in interstate commerce. The record before us, however, does not establish that the equipment at issue is used "principally" to build and repair facilities used in interstate commerce. The testimony regarding whether Imbach is engaged in interstate commerce [8] is clear. Xavier McGeady, Imbach's vice-president, testified that during the audit period, Imbach did not undertake any out-of-state jobs [9] and that at least ninety percent of Imbach's business was transacted in Maryland. He further testified that Imbach was not a transportation company and that the limited transportation undertaken was "to and from job sites." Additionally, he stated that the company was

> a marine construction company and heavy in foundations. We primarily do piers, bulkheads, bridges, repairing of piers, fender systems, fixing of some machinery on piers. We do cable work for the C & P Telephone Company—under water cable ... We do cable work for Baltimore Gas and Electric. We do a small amount of boating and ships for specialized, very specialized pieces of machinery. We do shore line erosion control work, and we do a lot of pile driving.

He explained that the piers and bulkheads were for commercial or government customers and were used to "tie up ships

---

8. *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 2, 6 L.Ed. 23 (1824) is the seminal case on interstate commerce. *Black's Law Dictionary* (6th ed. 1990) defines interstate commerce as "[t]raffic, intercourse, commercial trading, or the transportation of persons or property between or among the several states of the Union, or from or between points in one state and points in another state; commerce between two states, or between places lying in different states."

9. Specifically, he stated that Imbach "didn't build any piers outside the state."

and unload ships and load ships, and oil, cargo or oil and containers or lumber or cars, or whatever that particular pier is used for." He summed up Imbach's marine construction business as follows: five percent (5%) is used in loading and unloading ships or servicing ships; forty percent (40%) is used to load, unload, transport cargo and materials to the various job sites from Imbach's yard; thirty to forty percent (30–40%) is used to pour the concrete and to drive piles; and another five percent (5%) is used to repair telephone and electric cables in water.[10] Imbach would have us conclude that the applicability of the exemption should be controlled by the facility that is being built, rather than its own action. Thus, a logical extension of Imbach's vicarious interstate commerce theory would render the exemption applicable to equipment used to build interstate facilities such as highways, bridges and airports. We decline to interpret the exemption statute in such a manner. In so concluding, we are guided by *John C. Louis Co.*, 285 Md. at 539, 404 A.2d 1045, which holds that the established rule is "not to extend the tax statute's provisions by implication, beyond the clear import of the language used, to cases not plainly within the statute's language, and not to enlarge the statute's operation so as to embrace matters not specifically pointed out" and that "statutory tax exemptions are strictly construed in favor of the taxing authority." *C & P Telephone*, 317 Md. at 11–12, 561 A.2d 1034.

We further explain our conclusion by contrasting our holding in the case sub judice with our decision in *United Parcel Service.* There we opined that the exemption was applicable because even though "the delivery vans never cross state lines [and] [t]heir function is purely intrastate," "UPS present[ed] uncontroverted statistics indicating that over ninety percent of the freight handled by package delivery vans either originates within Maryland and is destined to points outside of Maryland or originates outside of Maryland and is destined to points inside Maryland." *United Parcel Service*, 69 Md.App. at 462, 518 A.2d 164. In other words, our decision was predicated

---

**10.** We are aware that at most this adds up to ninety percent.

upon the fact that nine out of ten packages handled by the vans were "interstate cargo." *Id.* at 463, 518 A.2d 164. Here the record before us does not indicate that Imbach is engaged in any firsthand transactions that can be construed as "interstate commerce." Accordingly, we hold that the sales and use tax exemption is not applicable because the subject equipment is not used in the "movement of passengers or property." *Id.* at 472, 518 A.2d 164.

## Legislative History

The legislative history and the Revisor's notes do not support Imbach's position. The legislative history indicates that § 326(gg) was enacted effective July 1, 1977. *See* H.B. 211, Chapter 394, Acts 1977. The Bill file indicates that the State Tax Reform Study Committee, chaired by Delegate (now Congressman) Benjamin L. Cardin, considered this section a mere statutory codification of Comptrollers' Rule 64.[11] In *United Parcel Service*, 69 Md.App. at 469–76, 518 A.2d 164, we reviewed the legislative history of old Rule 64 and noted that it did

> not impose any line-crossing requirement. The rule does not make any delineation in treatment between interstate carriers whose vehicles cross state borders and those whose

---

11. Rule 64 provided an exemption for tangible personal property sold to a person regularly engaged in interstate or foreign commerce for incorporation into or use on or by their vehicles which *transport* or *move either passengers or property across State lines or in foreign commerce.* Sales of vehicles which will regularly transport passengers or property *across State lines or in foreign commerce* are also exempt.
(emphasis added) *See* letter from Mr. Henry A. Heinmuller, Jr., Director, Retail Sales Tax Division, Comptroller of the Treasury, to Honorable Benjamin L. Cardin, Chairman, State Tax Reform Study Committee (June 21, 1976). This letter goes on to suggest to the Committee that "a specific statutory exemption be created for the sale, repair, alteration or conversion of large commercial vessels primarily engaged in interstate or foreign commerce." The Comptroller then proposed that the exemption read as follows
> The sale, repair, alteration or conversion of, and property for use on or by, a vessel of 50-ton burden or over, which is primarily engaged in carrying passengers or freight in interstate or foreign commerce.

vehicles do not cross state lines. Rather, the rule mandates that in order to qualify under the exemption, the passengers or freight must cross state boundaries. The proper focus of the rule, therefore, is not whether the vehicles cross state borders, but whether there is movement of "passengers or property across state lines."

*United Parcel Service,* 69 Md.App. at 470–71, 518 A.2d 164. We further posited that in enacting § 326(gg), the legislature intended "to preserve and clarify the existing scope of the tax exemption under Rule 64." *Id.* at 471, 518 A.2d 164. In other words, there is no indication that the Committee intended to give this section an expansive interpretation as suggested by Imbach; rather the General Assembly was enacting an exemption for entities engaged in transporting "passengers or property across state lines." Additionally, it is clear that a court can "refer to the Revisor's Notes when searching for legislative intent of an enactment." *Dean v. Pinder,* 312 Md. 154, 163, 538 A.2d 1184 (1988). We are also required to construe exemptions narrowly and in instances where there is any doubt, rule "in favor of the taxing authority." *C & P Telephone,* 317 Md. at 11–12, 561 A.2d 1034. In the instant case, the Revisor's notes do not indicate that the General Assembly intended to expand the scope of the exemption to include "*all* interstate commerce [that] is involved in the movement of passengers and freight" as suggested by Imbach. Accordingly, we conclude that the Tax Court was correct in giving the words of the exemption their ordinary and natural meaning. *See John C. Louis Co.,* 285 Md. at 539, 404 A.2d 1045.

## III.

During the Tax Court hearing, in an effort to demonstrate that the equipment in question was principally used in interstate commerce, Imbach sought to introduce testimony regarding federal law and regulations that were applicable to it. In particular, this proffered testimony would have indicated that Imbach had to register its vessels with the U.S. Coast Guard; that employees who worked on the vessels were

covered by the Jones Act and the Longshoremen's and Harbor Workers' Compensation Act; and that, in general, its activities were subject to many federal regulations. Specifically, Imbach asserted that

> interstate commerce is interstate commerce, whether it is in the sales tax statute, or whether it's in any other statute, the basis of which is regulating an entity. If [Imbach is] an interstate commerce for any number of things, whether it's for OSHA purposes, federal longshoremen and harbor workers compensation act, Jones Act ... or any number of regulatory schemes that they are subject to, if they are an interstate commerce for any of those regimes, they are an interstate commerce for the purposes of every other regime, including the Sales Tax provision.

The Tax Court sustained the Comptroller's objection and stated that

> I agree totally ... that you can have a situation where a company is in fact engaged in interstate commerce, and because of that there are certain federal regulations, rules, laws, whatever it may be, that they have to comply with. But there can be other aspects of the operation of that same company that ... [does not] necessarily fall into the category of interstate commerce.

On appeal, the Circuit Court held that the Tax Court erred in failing to allow Imbach to introduce such testimony.

The Comptroller asserts that the Circuit Court erred in remanding the case for further evidence on an issue barred by the Tax Court because the applicability of federal regulations is not probative of the relevant legal inquiry. We agree and explain. It is true, as asserted by Imbach, that due to the nature of their employment, some of its employees may be covered by the Jones Act and the Longshoremen's and Harbor Workers' Compensation Act and that its vessels have to be registered with the U.S. Coast Guard. That fact, however, does not determine whether Imbach's activities fall within the purview of the exemption statute. In other words, we conclude that Imbach's assertion that the testimony was relevant

to the issue of whether its vessels were engaged in interstate commerce is without merit.

## IV.

Finally, the Comptroller asserts that the Circuit Court erred in remanding the case to the Tax Court for further evidence on certain matters. In as much as we have reversed the Circuit Court's judgment, we need not address this issue.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED AND THAT COURT ORDERED TO ENTER JUDGMENT AFFIRMING THE JUDGMENT OF THE TAX COURT. COSTS ASSESSED TO BE PAID BY THE APPELLEE.**